UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
NICHOLAS MONIODES,                                :

                         Plaintiff,              :        Civil Action No.

        v.                                      :        **COMPLAINT**

AUTONOMY CAPITAL (JERSEY) LP,    :
ROBERT GIBBINS and IVAN RITOSSA, in their  :
individual and professional capacities,      :        **JURY TRIAL DEMANDED**

                    Defendants.        :
-------------------------------------------------------------X

Nicholas Moniodes ("Mr. Moniodes" or "Plaintiff"), by and through his attorneys, Wigdor LLP, as and for his complaint against Defendants Autonomy Capital (Jersey) LP ("Autonomy" or the "Company"), Robert Gibbins and Ivan Ritossa (collectively, "Defendants"), hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.     During his more than three decades in the financial services industry, Mr. Moniodes prided himself in his ability to provide the highest quality services, both to his employers and to their clients. Mr. Moniodes's dedication to ensuring that his clients' information was handled safely and securely made him a prominent and successful IT employee in the financial services sector.

2.     As a result of his extensive experience in the field, soon after starting at Autonomy Capital, Mr. Moniodes realized that the Company had massive holes in its cybersecurity systems, violating both the United States Securities and Exchange Commission's ("SEC") rules and industry best practices. Specifically, Mr. Moniodes discovered that Autonomy did not have up-to-date Data Loss Protection ("DLP") software in place to protect its

investors' Producer Price Index ("PPI") data. He further realized that the Company did not have sufficient Mobile Device Management ("MDM") DLP protection.

3. The impact of these holes in Autonomy's cybersecurity systems was potentially seismic and could leave the Company's clients vulnerable to having their data hacked by third parties, as well as to mass deletion in the event of an unexpected technology event. Mr. Moniodes knew that he could not allow these troubling cybersecurity deficiencies to go unaddressed.

4. To the contrary, Mr. Moniodes volunteered to the SEC that Autonomy did not have sufficient DLP software protections in place and that the Company was, therefore, in violation of applicable SEC rules. He also led the internal charge to address these issues.

5. Unfortunately, rather than thanking Mr. Moniodes for protecting the Company's clients' data and information, Autonomy retaliated against him for daring to inform the SEC about their cybersecurity issues, ultimately terminating his employment as a result.

6. Mr. Moniodes brings this action to recover damages arising from Defendants' unlawful retaliation against him for protected whistleblower activities in violation of Section 806 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A ("SOX") and the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, as amended, 15 U.S.C. § 78a, *et seq.* ("Dodd-Frank").

## ADMINISTRATIVE PROCEDURES

7. Plaintiff will file a complaint with the Occupational Safety and Health Administration ("OSHA") of the U.S. Department of Labor, alleging violations of Section 806 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A based on the same facts as alleged herein.

8. Upon OSHA's release of Plaintiff's OSHA complaint, Plaintiff will seek leave to

amend this Complaint to add SOX claims against Defendants.

9. Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

10. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Dodd-Frank.

11. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein occurred in this district.

## PARTIES

12. Plaintiff Nicholas Moniodes is the former Senior IT Executive at Autonomy Capital. At all relevant times, Plaintiff was an "employee" under all relevant statutes.

13. Defendant Autonomy Capital (Jersey) LP is a foreign limited partnership corporation, headquartered in Jersey, Channel Islands, United Kingdom with its principal place of business located at 2nd Floor, Conway House, Conway Street, St. Helier, Jersey, JE2 3NT. Autonomy is registered with the SEC, CIK# 0001484153. At all relevant times, Autonomy was an "employer" under the applicable statutes. Autonomy has employees and business operations at 90 Park Avenue, New York, NY 10016, at which offices Plaintiff worked.

14. Defendant Robert Gibbins ("Mr. Gibbins") is a Geneva, Switzerland resident and is the Founder and Chief Investment Officer of Autonomy. At all relevant times, Mr. Gibbins supervised the employment of Plaintiff and, accordingly, was an "employer" under all relevant statutes.

15. Defendant Ivan Ritossa is a resident of Australia and is the Chief Executive

Officer of Autonomy. Ivan Ritossa supervised the employment of Plaintiff and, accordingly, was an "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

### I. PROFESSIONAL BACKGROUND

11. Before joining Autonomy, Mr. Moniodes enjoyed a long career in the financial services industry, during which he developed substantial experience creating applications and infrastructure systems such as data centers, telecommunications, market data, networking, voice, server, storage, desktops, cloud, and multi-media.

12. Since beginning in the industry over 30 years ago, Mr. Moniodes has worked for some of the most prestigious Fortune 500 organizations and hedge funds globally, including Millennium Partners, Morgan Stanley, and Deutsche Bank.

13. At each of these companies, Mr. Moniodes was elevated to the most senior positions in the technology space. By way of example, while at Morgan Stanley, Mr. Moniodes was initially responsible for new and existing building base infrastructure (*e.g.*, UPS, generators, HVAC, and cabling), as well as perfecting critical global technologies (*e.g.*, data center, infrastructure systems, and trading floor systems).

14. Mr. Moniodes was quickly promoted to manage Morgan Stanley's data centers globally, and subsequently to manage its client technology for both the trading floor and back office.

15. As a result of his outstanding performance, Mr. Moniodes eventually was promoted to be the Chief Technology Officer ("CTO") based in Asia, which required that he oversee approximately 175 international locations.

16. After being recruited by Deutsche Bank to fill the role of CTO, Mr. Moniodes was responsible for managing all aspects of the company's North and South America infrastructure, including its global engineering, networking, telecommunications, market data, desktops, servers, storage, cyber-security, databases, and front-end business applications across the Americas.

17. In this position, Mr. Moniodes was responsible for over 26 locations in more than six countries, and was tasked with managing a team of 1,400 consultants and employees with an overall budget of nearly one billion dollars.

18. At Millennium Partners ("Millennium"), Mr. Moniodes was again hired to take on the dual roles of Co-CTO and Co-CIO.  Additionally, Mr. Moniodes was responsible for overseeing all of Millennium's direct market access for electronic trading.

19. During his tenure with Millennium, Mr. Moniodes was responsible for managing over 300 employees and consultants, as well as overseeing a budget of $325 million.

20. Therefore, when Autonomy was seeking to bring on a senior executive to evaluate the Company's trading platforms, risk procedures, technology, and digital processes, as well as its compliance and legal technical environments, it aggressively recruited Mr. Moniodes.

21. Mr. Moniodes was at all times in reality an employee of the Company.

22. He had a title, his own private office, an e-mail address, and telephone number, all provided by Autonomy.  The Company also reimbursed Mr. Moniodes for all of his business expenses and provided him an annual bonus at the same time that such bonuses were given to Autonomy's other employees.

23. Mr. Moniodes was required to work out of the Company's offices during business hours.

24. Mr. Moniodes also supervised several of Autonomy's full-time employees, had the authority to hire and fire the Company's employees, provided his direct reports with annual reviews, and determined their annual compensation. In addition, Mr. Moniodes attended a weekly management meeting that included Autonomy's other managerial personnel, all of whom were full-time employees.

25. As was the case with Autonomy's other managerial employees, Mr. Moniodes was required to submit all of his projects to his supervisor, the Company's minority owner and Chief Strategic Officer, Derek Goodman, for approval.

26. Moreover, Mr. Moniodes was given the authority to sign off on all of the invoices for the equipment, vendor services, desktop applications and usage-based costs purchased by Autonomy's Infrastructure and Technology Group.

27. Accordingly, Mr. Goodman told Mr. Moniodes, "You are an employee," and Autonomy held him out as an employee to its vendors, clients, and other employees.

28. Upon being hired in 2014, Mr. Moniodes set out to familiarize himself with Autonomy's entire technological infrastructure and quickly proceeded to conduct a comprehensive audit of the technology and business processes at the Company.

29. Based on the results of his audit, Mr. Moniodes spent the next three years making recommendations for strategic enhancements across the Company's trading, settlement/clearing, and technology platforms, including instituting a variety of projects to successfully address certain critical issues he had identified.

30. Mr. Moniodes and his team also made recommendations to improve, *inter alia,* Autonomy's Global Security Platforms, Global IT Infrastructure Systems, cloud migrations, technical engineering, and front-end client applications.

31. Subsequently, in 2018, Mr. Moniodes was promoted to be the Co-Head of Technology and was responsible for the Company's Technology Infrastructure and Cybersecurity teams. In this role, Mr. Moniodes was responsible for managing nine employees and consultants.

32. Throughout Mr. Moniodes's employment with Autonomy, he was praised for his performance, leadership, and innovative ideas.

33. Indeed, Autonomy rewarded him regularly for his success and dedication with compensation increases and bonuses.

34. Additionally, Mr. Goodman repeatedly singled-out Mr. Moniodes for praise, thanking him for his efforts and for the changes that he had implemented in Autonomy's technological infrastructure. Several other senior managers such as Greg Burnes also provided written praise to Mr. Moniodes.

## II. MR. MONIODES'S COMPLAINTS TO THE SEC ABOUT VIOLATIONS OF SECURITIES LAWS

35. Approximately two-and-a-half years ago, the SEC issued new regulations concerning cybersecurity issues designed to ensure that financial institutions had in place the type of software and hardware that would allow them to address the constantly evolving cybersecurity threats that such firms face. Especially in light of the high-profile data breaches that have affected some of the largest companies in the world over the last few years, the SEC's regulations emphasized the particular need for financial firms, such as hedge funds, to have robust structures in place to address DLP.

36. As part of his job duties with Autonomy, Mr. Moniodes was responsible for overseeing the Company's cybersecurity efforts to ensure that they were in compliance with applicable securities laws and regulations, including those promulgated by the SEC.

37. Beginning in 2019, Mr. Moniodes identified two different issues with Autonomy's cybersecurity system.

38. First, Autonomy did not have up-to-date DLP software in place to protect its investors' PPI data.

39. Second, given the widespread use of personal cellphones by Autonomy's employees, Mr. Moniodes recognized that the Company did not have sufficient MDM DLP protection.

40. Accordingly, he raised these issues with Autonomy's senior management, including in meetings with Matthew Levitan, Senior Legal Counsel, directly, as well as Mr. Goodman and Jason Gordon ("Mr. Gordon"), the Head of Compliance.

41. Autonomy, however, did not heed Mr. Moniodes's warnings and failed to take the required steps to address its DLP deficiencies at that time.

42. Subsequently, in mid-2019, during a telephone conference in the midst of an SEC audit into Autonomy's cybersecurity capabilities, Mr. Moniodes proactively admitted to the SEC that the Company did not have sufficient MDM DLP in place.

43. Mr. Moniodes did so in order to alert the SEC to the fact that the Company was aware that it was not in compliance with the relevant regulations. He also raised the issue of Autonomy's failure to properly protect its investors' PPI data with DLP software.

44. While David Cuddihy ("Mr. Cuddihy"), Head of Software Development, and Mr. Gordon led the discussion with the SEC, Mr. Moniodes was also present because, as the Company recognized, he was the individual most likely to have the necessary information that would be relevant to the SEC's concerns.

45. Indeed, during the course of the telephone conference with the SEC, Mr. Moniodes provided real-time information and responses to Messrs. Cuddihy and Gordon regarding the Company's failure to comply with the relevant regulatory laws, which they then contemporaneously conveyed directly to the SEC *verbatim* from Mr. Moniodes.

46. The information that Mr. Moniodes passed to the SEC through this discussion included that the Company was not complying with relevant SEC rules and regulations because it did not have sufficient MDM DLP software in place and also that it had failed to properly protect its investors' PPI data with DLP software.

47. In response to Mr. Moniodes's disclosure that Autonomy was not using the necessary DLP software, the SEC made it clear during the audit that such DLP software was required under the applicable security regulations.

48. Indeed, shortly after the meeting in which Mr. Moniodes raised Autonomy's DLP deficiencies with the SEC, the SEC cited the Company for its failure to have proper DLP protections in place.

49. The SEC's decision to cite Autonomy for the DLP deficiencies raised by Mr. Moniodes required the Company to scramble to get its cybersecurity capabilities and DLP measures into compliance.

50. In addition, these deficiencies posed serious risks to the Company's clients and customers (many of whom are large public entities), on whose behalf the Company manages very large assets and carries out transactions that could be compromised as a result.

51. Therefore, Autonomy verbally promised the SEC that, by the end of 2019, it would put in place a full DLP strategy covering both the MDM and PPI issues, a budget for the installation of DLP, and a proof of concept for the DLP.

52. All of these projects fell under Mr. Moniodes's purview, directly or indirectly, and he immediately went to work to complete them. As an example, although Mr. Cuddihy put together the strategy for the implementation of all DLP software, Mr. Moniodes's team commented on it and was responsible for completing the various tasks related to it.

53. By way of example only, Autonomy held a weekly meeting among the managers located in its New York offices to discuss the Company's business and challenges that needed to be met. Invariably, Mr. Moniodes used these meetings to raise the continued deficiencies with Autonomy's DLP efforts and the need to address them from an operational and regulatory standpoint.

54. Specifically, Mr. Moniodes and his team proceeded to identify two different pieces of software to address the DLP issues – InTune to address the Company's mobile DLP, and Netskope to protect the PPI data.

55. From approximately January through March 2020, Mr. Moniodes created multiple budget plans for 2020 that included the DLP costs and projections, as well as additional headcount to assist in dealing with these and other cybersecurity issues.

56. He also purchased new cellphones for the Company's employees in the Americas which were to be used solely for business purposes on which InTune could be installed.

57. Accordingly, beginning in the middle of 2019, Mr. Moniodes led the effort to recognize and address the DLP deficiencies for which Autonomy had been cited by the SEC.

### III. AUTONOMY RETALIATES AGAINST MR. MONIODES FOR HIS COMPLAINTS AND PROVIDING INFORMATION TO THE SEC ABOUT THE COMPANY'S DLP DEFICIENCIES

58. Regrettably, Mr. Moniodes's efforts to remedy Autonomy's DLP deficiencies received immediate pushback from the Company's majority owner, Mr. Gibbins.

59. By way of example, in late 2019, Sukie Dhesi, Mr. Gibbins's administrative assistant, told certain Autonomy employees that Mr. Gibbins was "unhappy" with Mr. Moniodes's efforts to address the Company's DLP issues that the SEC had cited. She also ominously referenced the fact that Mr. Gibbins intended to make a "change" in the Technology Department as a result of his unhappiness.

60. Given that Mr. Moniodes was spearheading Autonomy's efforts to bring its DLP software into compliance with SEC regulations, it was obvious that this "change" could only be referring to Mr. Moniodes's employment status.

61. Nevertheless, despite these thinly veiled threats, Mr. Moniodes moved forward with both the InTune and Netskope initiatives, and explained to Mr. Goodman and Craig Welter, the new Head of Compliance, as well as to other senior managers, that he believed Autonomy had no choice but to do so, given the Company's failure to meet its regulatory obligations under the securities laws and regulations.

62. Thereafter, in early 2020, Mr. Moniodes instructed his direct report, Florent Fernandez ("Mr. Fernandez"), to update Mr. Gibbins on the progress of his efforts to bring Autonomy's DLP capabilities into compliance with the previously issued SEC directives.

63. Given that Mr. Fernandez and Mr. Gibbins both worked out of the Company's office in Nyon, Switzerland, Mr. Moniodes hoped that Mr. Gibbins would be more open to the initiative if it was explained to him in person.

64. Unfortunately, to the contrary, Mr. Gibbins responded by telling Mr. Fernandez that Mr. Moniodes was somehow "disrespecting" him by continuing to address Autonomy's DLP deficiencies after Mr. Gibbins had previously made his unhappiness known regarding such efforts.

65. Once again, Mr. Moniodes insisted to Mr. Goodman that Autonomy was required by the SEC to proceed with its efforts to fix its DLP issues, notwithstanding Mr. Gibbins's objections.

66. The compliance concerns raised by Mr. Moniodes and opposed by Mr. Gibbins were confirmed by the Company's outside auditor ACA Aponix, which agreed that InTune implementation had to occur in order to satisfy regulatory requirements.

67. Shortly thereafter, in an attempt to placate Mr. Gibbins's open ire and animus, Mr. Moniodes wrote him an email in which he explained that Autonomy was required to install DLP software in order to comply with SEC regulations. Mr. Moniodes further explained that he in no way intended to be disrespectful, and that he hoped that Mr. Gibbins would recognize the need for additional DLP protections after an upcoming presentation that Mr. Moniodes planned to give on the subject. Without further explanation, Mr. Gibbins responded curtly that he was unhappy with Mr. Moniodes's push to improve the DLP capabilities at the Company.

68. Then, in February 2020, Mr. Moniodes and Mr. Cuddihy gave a joint presentation to about 30 members of Autonomy's management team concerning the corporate technology strategy for 2020.

69. As part of the presentation, Mr. Moniodes went through the cybersecurity enhancements that had been approved by Mr. Goodman and Mr. Welter for implementation, including the InTune and Netskope software for mobile DLP and PPI data protection, respectively. Mr. Moniodes explained that other hedge funds were using similar technologies to comply with SEC requirements. Mr. Gibbins, who attended the meeting by videoconference, sat stone-faced throughout Mr. Moniodes's presentation and quickly moved the meeting on to other topics.

70.     Within days, Mr. Moniodes discussed his presentation with Mr. Ritossa, who was poised to become the Company's new CEO as of April 2020, to get his feedback.  During this conversation, Mr. Moniodes told Mr. Ritossa that Autonomy was going to be adding two new employees to help him with upcoming networking/cybersecurity projects, including implementation of InTune and Netskope.  Tellingly, Mr. Ritossa immediately responded to Mr. Moniodes with agitation, stating that he needed to speak with Mr. Gibbins about the two new hires.

71.     Soon thereafter, Mr. Gibbins wrote Mr. Moniodes an email and summarily informed him that he was overruling Mr. Moniodes's decision, and that Mr. Moniodes would not be able to hire anyone without his express approval.  Shortly thereafter, Mr. Gibbins announced that he was shutting down most technology work on the DLP initiatives (the same ones that Mr. Moniodes had made it expressly clear were tied to SEC directives and requirements).

72.     Again, Mr. Moniodes pushed management in New York to proceed with the installation of the DLP software, given both the SEC's regulations and the promises that Autonomy had made to the SEC in response to the citation it had already received.

73.     To that end, Mr. Moniodes pushed forward with the InTune Proof of Concept effort in February and March 2020, which Autonomy had previously assured the SEC would be completed by the end of 2019.  Given that the Company was already more than two months past the deadline it had agreed upon with the SEC, Mr. Moniodes made clear that the project could not be further delayed.

74.     At the end of March 2020, after the Company began working remotely in response to the COVID-19 pandemic, Mr. Moniodes also informed Mr. Ritossa in writing that the computer setup in his home office violated both U.S. and European regulatory requirements

(citing the need for "hardening cybersecurity of Ivan Ritossa's home environment").  This was because Mr. Ritossa's setup did not use multi-factor authentication for his email and co-mingled his personal and corporate email accounts to conduct Company business.

75. Approximately two weeks later, on Friday, April 17, 2020, Mr. Moniodes was abruptly told that his employment was being summarily terminated because the Company purportedly had no further use for his services.  The termination was communicated to Mr. Moniodes under the pretextual guise of a "restructuring."

76. Tellingly, upon information and belief, shortly after Mr. Moniodes was terminated, Autonomy put a stop to most of the cybersecurity regulatory initiatives that Mr. Moniodes had been in the midst of completing.

**FIRST CAUSE OF ACTION**
**(Dodd-Frank Act Whistleblower Retaliation Claim)**
*Against All Defendants*

80. Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

81. Plaintiff reasonably believed that Defendants were engaging in conduct that was in violation of various federal regulatory compliance requirements (including those administered and enforced by the SEC), the Dodd-Frank Act, and U.S. securities laws.

82. Plaintiff's beliefs were reasonable and he acted in good faith.

83. Plaintiff utilized internal and external reporting procedures, including informing the SEC of Defendants' misconduct.

84. Plaintiff was a whistleblower within the meaning of § 78a of Dodd-Frank and, as such, is afforded the protection of the anti-retaliation provisions of that statute.

85. Plaintiff engaged in "protected conduct" within the meaning of § 78a of the Dodd-Frank Act.

86. Defendants took adverse action against Plaintiff's employment in retaliation for Plaintiff's protected conduct which Defendants would not otherwise have taken against him, including by virtue of terminating his employment.

87. Plaintiff has been substantially harmed by reason of Defendants' unlawful conduct and has suffered losses and damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants for the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States;

B. Other injunctive relief, including, but not limited to, an order barring Defendants from any conduct that would tend to injure Plaintiff's professional or personal reputation and/or that would interfere with his employment or ability to find new employment, and/or an order requiring Defendants to reinstate Plaintiff to the position at Autonomy that he would be holding at the Company at that time had the Company not unlawfully terminated his employment;

C. An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate Plaintiff for all monetary and/or economic damages (including, but not limited to, both past and future lost and reduced income, earnings, and/or earning capacity);

D. An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate for all non-monetary and/or compensatory damages, including, but

not limited to, compensation for Plaintiff's emotional distress and/or damage to his professional reputation;

E.  An award of punitive damages in an amount to be determined at trial;

F.  Prejudgment interest on all amounts due;

G.  Post-judgment interest as may be allowed by law;

H.  An award of Plaintiff's reasonable attorneys' fees and costs; and

I.  Such other and further relief as Plaintiff may be entitled to or recover under applicable law, and/or which the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: July 21, 2020
New York, New York

Respectfully Submitted,

**WIGDOR LLP**

By: _____
Lawrence M. Pearson
Parisis G. Filippatos
Renan F. Varghese

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
lpearson@wigdorlaw.com
pfilippatos@wigdorlaw.com
rvarghese@wigdorlaw.com

*Counsel for Plaintiff*